(February 19, 1916.)

## BLACKWELL LUMBER CO., a Corporation, Appellant, v. EMPIRE MILL CO., a Corporation, Respondent.

[155 Pac. 680.]

EMINENT DOMAIN — COMPLAINT — DEMURRER — PRIVATE PROPERTY — PUBLIC USE—MATERIAL RESOURCES—TIMBER RESOURCE—COMPLETE DEVELOPMENT OF—CONSTITUTIONAL CONSTRUCTION—SELF-EXECUTING PROVISIONS—JUDICIAL QUESTION—PROCEDURE.

1. *Held,* that the complaint states a cause of action and the court did not err in overruling the demurrer.

2. Sec. 14 of art. 1 of the state constitution declares for what purposes the power of eminent domain may be exercised, and the legislature cannot make the provisions of that section any more effective by enacting them into statute law.

3. To the extent of establishing the nature of the use for which privately owned property is necessary to the complete development of the material resources of the state, the provisions of said sec. 14 of the constitution are self-executing, and the courts of general jurisdiction are vested with the power to determine, upon judicial inquiry, whether or not any particular use for which land is sought to be appropriated is "necessary to the complete development of the material resources of the state."

[As to what constitutes public use, see note in 102 Am. St. 813.]

4. In said sec. 14 of the constitution, the people have declared the necessary use of lands to the complete development of the material resources of the state to be a public use, and the legislature has provided a procedure to subject such lands to such use.

5. After the adoption of sec. 14, art. 1, of the constitution, it only remained for the legislature to provide the procedure to carry into effect the provisions of said section. The legislature, however, might add to the public uses enumerated in said section, but it could not annul or repeal any of the uses therein specified.

6. That clause of said section, to wit, "subject to the regulation and control of the state," refers to the machinery or procedure necessary to subject private lands to a public use.

7. By that provision of said sec. 14, to wit, "or any other use necessary to the complete development of the material resources of the state is hereby declared to be a public use," it was intended to and does include and cover every material resource of the state, and it is for the court to determine upon the facts of each case whether or not the case comes within the provisions of said section of the constitution.

8. Where it is provided in the constitution in express terms for what purposes the right of eminent domain may be exercised, and public uses are defined therein, such provision is the expression of the sovereign will, and grants the right as effectually as if expressed in a legislative act, and can be enforced when such grant is supplemented by an act of the legislature providing the procedure for the exercise of such right.

9. Under the provisions of said sec. 14, the right of eminent domain is permitted on the theory of a public use for the "complete development of the material resources of the state," even where the public may have no direct interest in the exercise of the right of eminent domain and the main end of which is private gain, and where the benefit to the people at large could result indirectly and incidentally only from the increase of wealth and the development of those material resources.

10. The constitution and statute provide that full compensation shall be paid for all lands taken for a public use.

11. *Held,* that where a temporary logging road is necessary to the complete development of the material resources of the state, the necessary use of land for a right of way is a "public use," and may be acquired as provided by the statute.

APPEAL from the District Court of the First Judicial District, for Shoshone County. Hon. John M. Flynn, Judge.

Action to condemn a right of way over private lands for a temporary logging road. Judgment for defendant. *Reversed.*

John P. Gray and W. F. McNaughton, for Appellant.

This court has expressly held that the lumber industry is one of the great material resources of the state in *Potlatch Lumber Co. v. Peterson,* 12 Ida. 769, 118 Am. St. 233, 88 Pac. 426. Sec. 14, art. 1, of the constitution is self-executing. (*Potlatch Lumber Co. v. Peterson, supra*), and the legislature was vested only with the power of providing a mode of procedure by which to subject the lands to such uses. (*Washington Water Power Co. v. Waters,* 186 Fed. 572; *Lamborn v. Bell,* 18 Colo. 346, 32 Pac. 989, 20 L. R. A. 241; *Crystal Park Co. v. Morton,* 27 Colo. App. 74, 146 Pac. 566, 571; *Spratt v. Helena Power Transmission Co.,* 37 Mont. 60, 94 Pac. 631.)

Sec. 14, art. 1, is a limitation of power upon the legislature, and not a grant of power. (*Portneuf Irrigating Co. v. Budge,* 16 Ida. 116, 100 Pac. 1046, 18 Ann. Cas. 674.)

"The legislature, neither by neglect to act nor by legislation, can nullify a mandatory provision of the constitution." (*Day v. Day,* 12 Ida. 556, 86 Pac. 531, 10 Ann. Cas. 260; *Davis v. Burke,* 179 U. S. 399, 21 Sup. Ct. 210, 45 L. ed. 249.)

Such a use is a public use, irrespective of the fact that the public as a whole or any considerable part thereof will be users of the right of way. (*Baillie v. Larson,* 138 Fed. 177; *Latah County v. Peterson,* 3 Ida. 398, 29 Pac. 1089, 16 L. R. A. 81; *Rawson-Works Lumber Co. v. Richardson,* 26 Ida. 37, 141 Pac. 74.)

"It is enough if the taking tends to enlarge the resources, increase the industrial energies and promote the productive power of any considerable part of the inhabitants of a section of the state, or leads to the growth of towns and the creation of new channels for the employment of private capital and labor, as such results indirectly contribute to the general prosperity of the whole community." (*Potlatch Lumber Co. v. Peterson, supra; Boston & Roxbury Mill Dam Corp. v. Newman,* 12 Pick. (Mass.) 467, 23 Am. Dec. 622; *Hazen v. Essex County,* 12 Cush. (Mass.) 475; *Murdock v. Stickney,* 8 Cush. (Mass.) 113; *Turner v. Nye,* 154 Mass. 579, 28 N. E.

1048, 14 L. R. A. 487; *Scudder v. Trenton Delaware Falls Co.*, 1 N. J. Eq. 694, 23 Am. Dec. 756; *Great Falls Mfg. Co. v. Fernald*, 47 N. H. 444; *Head v. Amoskeag Mfg. Co.*, 113 U. S. 9, 5 Sup. Ct. 441, 28 L. ed. 889; *Otis Co. v. Ludlow Mfg. Co.*, 201 U. S. 140, 26 Sup. Ct. 353, 50 L. ed. 696; *Hand Gold Min. Co. v. Parker*, 59 Ga. 419; *Dayton Gold & Silver Min. Co. v. Seawell*, 11 Nev. 394; *Overman Silver Min. Co. v. Corcoran*, 15 Nev. 147; *Byrnes v. Douglass*, 83 Fed. 45, 27 C. C. A. 399; *Clark v. Nash*, 198 U. S. 361, 25 Sup. Ct. 676, 49 L. ed. 1085, 4 Ann. Cas. 1171; *Strickley v. Highland Boy Gold Min. Co.*, 200 U. S. 527, 26 Sup. Ct. 301, 50 L. ed. 581, 4 Ann. Cas. 1174.)

C. W. Beale, for Respondent.

If it is the desire of the Blackwell Lumber Company to enable the owners of timber in Shoshone and Kootenai counties, and particularly the owners of timber adjacent to the St. Maries river and its branches and tributaries, to transport to market such timber and also to afford itself a means of transportation for all the timber it owns in these portions of Northern Idaho, the law has provided a means and under *Connolly v. Woods*, 13 Ida. 591, 92 Pac. 573, and *McLean v. District Court*, 24 Ida. 441, Ann. Cas. 1915D, 542, 134 Pac. 536, this appellant can cause to be organized a railroad company to construct whatever lines it finds necessary to enable it to reach all the timber referred to in the complaint herein. "The power of eminent domain being in derogation of the common right, acts conferring it are to be strictly construed and are not to be extended beyond their plain provisions. The right to exercise the power is strictly limited to the purposes specified in the statute conferring it. The proposed use of the lands of the owner must be clearly embraced within the legitimate object of the power conferred." (15 Cyc. 567; *In re Providence & W. R. Co.*, 17 R. I. 324, 21 Atl. 965; *Ligare v. City of Chicago*, 139 Ill. 46, 32 Am. St. 179, 28 N. E. 934.)

A party seeking the right of condemnation must not only show that the use for which he would condemn is a public

use within our constitution, but also that the legislative machinery has been provided for the exercise of such use. (*Idaho-Western Ry. Co. v. Columbia Conference etc. Synod*, 20 Ida. 568, 119 Pac. 60, 38 L. R. A., N. S., 497; *Thomas v. Boise City*, 25 Ida. 522, 138 Pac. 1110; Lewis on Eminent Domain, 3d ed., secs. 367–388; *Inspiration Consolidated Copper Co. v. New Keystone Copper Co.*, 16 Ariz. 257, 144 Pac. 277; *Long v. Billings*, 7 Wash. 267, 34 Pac. 936.)

It was held by this court in *Potlatch Lumber Co. v. Peterson*, 12 Ida. 769, on page 788 (118 Am. St. 233, 88 Pac. 426), that the provision in said section 14 of the constitution is not self-executing. From a most careful investigation of the decisions of the supreme court of this state wherein the right of eminent domain has been upheld, it is found in every instance that the use for which the private property has been sought is a use declared a public use by some subdivision of sec. 5210, Rev. Codes. The aforesaid provision of sec. 14 having been declared by this court not self-executing, and the legislature not having amended sec. 5210 so as to include therein as a public use the right to condemn private property for a logging road, that right does not exist in Idaho.

SULLIVAN, C. J.—The plaintiff corporation, the Blackwell Lumber Co., commenced this proceeding for condemnation of a right of way for a logging railroad. A general demurrer was sustained to the complaint. Thereafter the plaintiff declined to amend and elected to stand upon its complaint and judgment of dismissal was entered. The appeal is from the judgment, and it is recited in the notice of appeal that the appeal is taken from the order sustaining defendant's demurrer and from the judgment.

The complaint in effect alleges that the plaintiff is an Idaho corporation engaged in the lumbering industry, with authority to build, erect, operate and control sawmills and lumber manufacturing plants; to deal in lumber and timber products; to own, improve, buy and sell lands and the timber thereon; to construct, maintain and operate plants and works for the improvement and development of such lands and to acquire,·

construct and operate lumber and logging railroads, roads, tramways, chutes, ditches and flumes; that the plaintiff is the owner of a large amount of standing timber and timber lands in Kootenai and Shoshone counties, Idaho, and that that portion thereof where the lands of the plaintiff, from which it desires to remove its timber, are situated, is principally a lumbering country and the chief industry carried on there is the lumbering business; that large numbers of people are engaged in logging operations and in the transportation of logs to market; that the prosperity of the country depends on the lumber industry; that the business conducted in that part of Shoshone county where these particular lands are situated is entirely dependent upon the lumber industry; that plaintiff owns sawmills, one at Fernwood, Idaho, and one at Coeur d'Alene, Idaho, which employ large numbers of men, which mills furnish employment to a large number of people, upon which the prosperity of that part of the country largely depends; that while the forests are valuable for timber products thereon, their value is dependent upon the ability of the owners to transport the timber to the mills; that among other lands owned by plaintiff are 400 acres upon which there are quantities of valuable timber which the plaintiff desires to transport to its said mills, and that the only reasonable or practicable method of removing said timber and transporting same to its mills is by transportation of the same from said lands to the Chicago, Milwaukee & St. Paul Railroad by a temporary spur or logging railroad; that is, a railroad graded from a point on the line of said Milwaukee railway to points upon said lands of the plaintiff, and laying steel rails and the transporting of said logs from the lands over said temporary logging spur or railroad with shay or geared engines; that none of the timber standing upon said lands of the plaintiff can be profitably or economically or feasibly or at all transported to the mills of the plaintiff or to the market except by means of the transportation above described, and unless the plaintiff can so construct such temporary logging railroad and is given power to condemn a right of way for said logging railroad, the said timber lands and the timber

thereon will remain undeveloped and the development of that
material resource of the state be seriously and continuously
retarded, so far as the said lands are concerned; that there
is but one reasonable or feasible route and that in part ex-
tends over and across certain lands of the defendant, which
lands are described in the complaint as the lands sought to
be condemned; that none of the timber standing upon the
lands of the plaintiff, described in the complaint, can be
profitably or economically transported except by means of
the construction of said proposed logging road; that there
is a necessity for the appropriation and condemnation of said
land, and that the removal of said timber develops one of
the material resources of the state of Idaho; that there is no
other way by which said timber can be transported; that
the denial of the right to the use of the lands of defendant
and of others similarly situated would be disastrous to the
growth and prosperity of the state and largely hinder and
retard the development of one of its material resources; that
the right of way sought to be acquired over defendant's lands
is a way of necessity, because of the situation of plaintiff's
and defendant's lands and the topography of the country
adjoining; that the road which the plaintiff desires to con-
struct from the main line of said Milwaukee railroad, except
over the lands of the defendant, crosses only the lands owned
by the plaintiff or lands across which plaintiff has procured
the right of way to build said logging railroad; that the
plaintiff has been unable to secure any settlement with de-
fendant or to acquire said right of way across its said land;
that the plaintiff will be able to remove from its lands and
transport across said right of way sought to be acquired in
this action, all of the timber which it desires to remove at
this time in a very few months and the use sought for the
lands of the defendant is therefore but temporary; that plain-
tiff will not materially affect or injure the lands of the
defendant or injure the same at all; that while plaintiff is
operating its said road across the land of defendant, it will
be perfectly willing that it shall use the said line or road, the
said use to be in such a manner as not to interfere with the

plaintiff's use thereof; or, at the election of the defendant, the plaintiff will, for a reasonable consideration, transport any logs or timber products from the lands of the defendant to the Milwaukee railway while plaintiff is operating its said road and engaged in removing its said timber; that after plaintiff has removed its said timber and ceased to operate upon its said lands, it will, within a reasonable time, remove the ties and rails placed across the land of the plaintiff, leaving the grade only of said railroad upon said land.

As above stated, the court sustained a general demurrer to said complaint.

It is contended by counsel for respondent that said complaint contains conclusions of law and many irrelevant, redundant and immaterial allegations that have no place in the complaint and the truth of which for that reason is not admitted by the demurrer, but stripped of such immaterial matter there is nothing left of the complaint which the lower court could have taken cognizance of in arriving at its decision on said demurrer other than the allegations to the effect that the plaintiff is a corporation; that the defendant is a corporation; that appellant owns 400 acres of land; that the respondent is the owner of 120 acres of land; that appellant desires to construct a temporary logging road over and through said 120 acres of timber land of the respondent for the temporary use of plaintiff for the purpose of transporting thereover any timber it may remove from its said 400 acres of land, and thereafter within a few months it will take up the temporary railroad and remove the same from the strip of respondent's land from which appellant has cut a swath of respondent's timber for the purpose of constructing said logging railroad.

This court held in *Idaho-Western R. Co. v. Columbia Conference etc. Synod*, 20 Ida. 568, 119 Pac. 60, 38 L. R. A., N. S., 497, as follows:

"The statute requires the condemnor to disclose the purpose for which he is seeking to condemn the property and the general nature and character of the improvement or structure he expects to erect in order to bring himself within

the constitution and statute (sec. 14, art. 1, Const.; sec. 5210, Rev. Codes), and entitle him to maintain his condemnation proceeding.''

While there is some redundant matter in said complaint that might have been stricken out on motion, no motion was made for that purpose, and since it was not stricken out, we will proceed to determine the case upon all of the facts alleged which we consider are necessary and well pleaded. We shall consider all of the facts which are necessary to bring the case within the provisions of sec. 14, art. 1, of the state constitution and the statute—facts sufficient to show that the proposed use of the land is embraced within the legitimate object or purpose of the right conferred by said section of the constitution, which is as follows:

''The necessary use of lands for the construction of reservoirs or storage basins, for the purposes of irrigation, or for the rights of way for the construction of canals, ditches, flumes or pipes to convey water to the place of use, for any useful, beneficial or necessary purpose, or for drainage; or for the drainage of mines, or the working thereof, by means of roads, railroads, tramways, cuts, tunnels, shafts, hoisting works, dumps, or other necessary means to their complete development, or any other use necessary to the complete development of the material resources of the state or the preservation of the health of its inhabitants, is hereby declared to be a public use, and subject to the regulation and control of the state.

''Private property may be taken for public use, but not until a just compensation, to be ascertained in a manner prescribed by law, shall be paid therefor.''

The use of land necessary to the complete development of the material resources of the state is declared by said section to be a public use.

It is contended by counsel for respondent that after excluding from said complaint all irrelevant and immaterial matter, there is nothing left for determination on this appeal but the one question, and that is whether the plaintiff corporation may condemn a right of way over the lands of

defendant for a temporary logging railroad to remove the timber from four hundred acres of land which lies up the gulch from defendant's land.

All of the allegations of the complaint which are well pleaded are admitted by the demurrer, and those allegations show that there is a large amount of merchantable timber growing on appellant's land, and that there is no other feasible way to market the same except by the construction of a logging railway. But it is contended that the marketing of said timber is for the private use of the plaintiff corporation and not for any "public use."

Said provision of the constitution was enacted by the people themselves, and by the provisions of that section the people have declared, after reciting some things in particular for which private land may be condemned and taken under the eminent domain act, "or any other use necessary to the complete development of the material resources of the state . . . . is hereby declared to be a public use, and subject to the regulation and control of the state."

The complaint states a cause of action.

The main question presented for determination is whether or not a lumber company in developing the timber industry and lands of the state has a right to acquire under the law of eminent domain a right of way for a temporary logging railroad across the land of another for the purpose of removing the timber from its own land which cannot, owing to the mountainous or topographical condition of the country, be otherwise removed.

It will not be disputed but that one of the great material resources of the state is in the vast forests growing in the mountains of many of the counties of the state, and the history of the timber industry of the state clearly shows that the timber resources cannot be fully developed without the construction of temporary logging railroads. It is so alleged in the complaint and admitted by the demurrer.

But it is contended by counsel for respondent that since the timber industry is not specified in said section of the constitution as one of the material resources of the state, the

legislature has not declared that rights of way for private logging railroads may be condemned under the eminent domain laws of the state; that it is for the legislature to declare what are the material resources of the state and not for the courts, under the provisions of that section of the constitution.

It is true, the timber industry is not specifically or in terms named as one of the "material resources of the state," but it is included in that provision of said section which is as follows: "Or any other use necessary to the complete development of the material resources of the state . . . . is hereby declared to be a public use."

As to what are the material resources of the state depends upon facts, and as to whether those material resources can be completely developed without the exercise of the right of eminent domain also depends upon facts, and it must be conceded that the courts are better equipped to investigate and determine those questions than is the legislature, and to determine whether a logging railroad is necessary to the "complete development" of the timber resources of the state. If timber is one of the material resources of the state, the legislature could not nullify the "material resource" provision of said section by declaring that it was not a material resource. The legislature, recognizing that fact, has not attempted since the adoption of the constitution to specify by name, or define what are, the many material resources of the state that cannot be "completely developed" without the exercise of the right of eminent domain.

In a very well-considered decision in the case of the *Washington Water Power Co. v. Waters*, 186 Fed. 572, Judge Dietrich, of the U. S. district court of Idaho, has considered very carefully the question as to whether that provision of sec. 14, art. 1, of the constitution, which provides that "any other use necessary to the complete development of the material resources of the state or the preservation of the health of its inhabitants is hereby declared to be a public use" is self-executing or not, and it is there stated that "the controversy is reduced to substantially a single question, namely,

whether or not under this general clause, in the absence of an expression of legislative will, the judicial department is authorized to determine whether or not a given use is generally or under the particular circumstances of the case, 'necessary to the complete development of the material resources of the state, or the preservation of the health of its inhabitants,' It is the position of the plaintiff that such power is conferred upon the courts, and, upon the other hand, the defendants contend that it is exclusively within the province of the legislative department to determine specifically what uses are necessary to the development of the state, or to the health of its inhabitants; in other words, that the clause is to be construed as a delegation of authority, not to the courts, but to the legislature.

"While the question is not entirely free from doubt, my first impression was, and my view still is, that to give the constitutional declaration effect, it was necessary for the legislature only to prescribe the requisite judicial procedure, which it is thought is amply provided for in the general statutes pertaining to proceedings in eminent domain. As will be noted, it is declared by the constitution that any use 'necessary to the development of the material resources of the state, or the preservation of the health of its inhabitants,' is a public use, and to this statement is appended the further declaration that 'private property may be taken for a public use, but not until a just compensation, to be ascertained in a manner prescribed by law, shall be paid therefor.' It is well understood that the power of eminent domain is an incident of sovereignty, and may therefore be exercised either by the federal government, or by a state, by virtue of its sovereignty. In the absence of constitutional limitations, the authority to declare for what purposes and under what circumstances and in what manner the power may be exercised rests in the legislature. However, the people, the primary source of all power, instead of leaving such authority to the unrestricted discretion of their representatives in the legislature, may express their will in the paramount law, the constitution, and it may not be doubted that their will so

expressed directly is. quite as effective as if, through representatives, it were expressed indirectly in the legislative enactment. . . . . It may not be doubted that the declarations contained in the constitution are at least of equal dignity with those contained in the statute, and are quite as effective as they would be if they had been made by the legislature instead of directly by the people. That being true, and the legislature having provided the judicial procedure for condemning property for a public use, it is clear, for instance, that if from section 5210 of the statutes, which as already stated, specifically designates in detail a large number of purposes in behalf of which the right of eminent domain may be exercised, there were omitted all references to the 'use of lands for the construction of reservoirs, or storage basins for the purposes of irrigation,' the right and power to condemn for such purposes would still be complete because by the fundamental law of the state such a purpose is expressly declared to be a public use, and by general statutory law the mode and method of ascertaining the just compensation and of condemning property for public use has been prescribed. There is nothing left to be done. Taking the constitution and the statutes together, the law is clear, comprehensive and complete. . . . . in other words, what by the term of the constitution is declared to be a public use is such a use quite as fully before as after the legislature speaks. To the extent of establishing the nature of the use, therefore, the constitution must be held to be self-executing, and the nature of such a use is not in any wise affected by an affirmative or a negative declaration of the legislature, or by its silence.''

We are in full accord with the views expressed by Judge Dietrich in the foregoing opinion, and hold that to the extent of establishing the nature of the use for which privately owned land is necessary to the complete development of the material resources of the state, that provision of the constitution is self-executing, and the nature of such use is not in any wise affected by an affirmative or negative declaration of the legislature or by its silence; and, as there held, the lan-

guage used is general, but it is sufficient to invest the courts with the power to determine upon judicial inquiry whether or not any particular use for which the land is sought to be appropriated is necessary to the complete development of the material resources of the state. If it were intended that those provisions should not become operative until the legislature should declare and specify by name each material resource of the state, it is very strange that such intention was not expressed by the framers of the constitution. There is no inherent difficulty in the performance of that function by the courts. It is not extrajudicial in its nature and is closely akin to inquiries which courts are ordinarily under the necessity of making when the right to condemn is put in issue.

A complete procedure for the taking of property for a public use was provided by the territorial legislature as early as 1881 (see Code Civ. Proc. 1881, p. 190, sec. 851 et seq.), and the procedure there provided is found in the Revised Codes of 1909 from sec. 5215 to sec. 5229, inclusive. Sec. 5213, Rev. Codes, provides that before property can be taken for a public use, it must first appear that the use to which it is to be applied is a use authorized by law, and that the taking is necessary to such use. The procedure provided is commenced by filing a complaint and issuing a summons. (Sec. 5215.) Sec. 5216 provides what the complaint must contain, and in the third subdivision thereof it is provided that the complaint must contain a statement of the rights of the plaintiff. Sec. 5217 provides that a summons must issue and be served upon the proper parties. Sec. 5220 provides that the court, jury or referee must hear such legal testimony as may be offered, and must ascertain and assess the value of the property sought to be condemned, and specifies what things must be taken into consideration in the assessment of damages. In fact, said statutes provide a complete judicial procedure in cases of this kind. The framers of the constitution no doubt concluded that the courts were just as competent, and even more so, to determine the question here involved, as is the legislature.

In the state of Washington the people so declared in the constitution of that state. (See sec. 16, art. 1, of the Const. of Wash. 1889.) It is there provided:

"Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public."

The constitution of the state of Washington was adopted by the Constitutional Convention on August 22, 1889, and that state was admitted into the Union on the 11th of November, 1889, by the proclamation of the President of the United States, as provided by an enabling act; while the constitution of the state of Idaho was adopted by the Constitutional Convention on August 6, 1889, but it was not admitted as a state until the 3d of July, 1890. The constitution of Washington was adopted under the specific authority of a congressional enabling act, while the constitution of Idaho was adopted without any enabling act of Congress. Since the constitution of Idaho was adopted by the convention at least twelve days before the constitution of Washington was adopted by the Constitutional Convention of that state, the Idaho Constitutional Convention could not have had before it the constitution of the state of Washington.

There is no doubt that where the constitution of a state is wholly silent upon the subject, the power of eminent domain rests entirely with the legislature. The provisions of sec. 14, art. 1, of the constitution of Idaho, so far as they define what are public uses, must be construed, not as a delegation of, but as a limitation upon, the power of the legislature to nullify any of the uses mentioned in the constitution.

Judge Dietrich, in the Washington Water Power case, evidently followed the case of *Potlatch Lumber Co. v. Peterson*, 12 Ida. 769, 118 Am. St. 233, 88 Pac. 426, in which case this court held that the provisions in regard to the power of eminent domain and the taking of private property for a public use, contained in said sec. 14 of article 1, emanated directly from the people instead of from the legislature, thus

emanating from a higher power than the legislature—the people themselves. This court there held that the framers of our constitution understood that a complete development of the material resources of Idaho could not be made unless the power of eminent domain was made broader than it was in many of the constitutions of the older states of the Union; that owing to the topography of the state, its mountain fastnesses and the great difficulty in preparing and constructing means and modes of communication and transportation, it was considered a necessity to the "complete development of the material resources of the state" to enlarge and broaden the power of eminent domain in this state; hence the adoption of said sec. 14 of art. 1.

This court held in the Potlatch Lumber Company case that the lumbering interest of the state was one of the material resources of the state; that such material resource could not be completely developed without the exercise of the power of eminent domain, and that the legislature could not annul that provision of the constitution by any legislative enactment. Referring to that provision of the constitution here under consideration, the court there said:

"But it is contended by counsel that said provision is not self-executing. We may concede that contention, but the legislature has prescribed the procedure for subjecting land to a public use or for exercising the right of eminent domain. Thus by legislative enactment that provision of the constitution is made effective. The people in this constitution have declared that the necessary use of lands to the complete development of the material resources of the state is a 'public use,' and the legislature has provided the procedure to subject such lands to that use."

The court there conceded that said provision of sec. 14 was not self-executing unless a procedure were provided which could be followed in the courts for the purpose of condemning land or exercising the right of eminent domain, but did not hold, or intend to hold, that the legislature must define in terms or otherwise what are the material resources of the state. The legislature having already provided the proce-

dure, it was not necessary for it to enact said sec. 14, art. 1, into statute law in order to make those provisions effective. This was the effect of the decision in the Potlatch Lumber Company case.

After the adoption of said section of the constitution by the people, it only remained for the legislature to provide the procedure, which it had already done. The legislature might add to the public uses enumerated in said sec. 14, but it could not annul or repeal any of the provisions of said section.

Counsel for respondent lays much stress on that clause of sec. 14, art. 1, to wit, "subject to the regulation and control of the state," and refers at some length to the constitutional debates in support of his position. As we understand his quotations, they are not in accord with the views contended for by him. In vol. 1, p. 330, of the Idaho Constitutional Convention Debates, referring to said section, Judge Claggett said: "The committees who have considered this matter have suggested this substitute, which has simply defined and declared—or rather has simply declared what shall be considered public uses and then the machinery for the execution of any public use is left entirely to the legislature." And at page 333 of the same volume, Judge Beatty asked the following question: "I would like to ask if, under the provisions of that amendment, one farmer can run his irrigating ditch across another farmer's land?" Judge Claggett replied: "That depends entirely with regard to what the legislature may say. If it does not take action the power is not conferred; if the legislature leaves it out, he cannot. The machinery of the whole thing is left to the legislature."

As we view it, Judge Claggett simply stated that the "machinery" or the procedure for condemning land for a public use was left to the legislature. Judge Beatty then asked: "Then under the provision as there made, that power you do not concede is granted?" Judge Claggett replied: "Not of itself,—it does not exercise itself, but I am not one of those who say that we should put in our constitution the broad declaration to the effect that private property can

only be taken for public uses and then stop there. Then in case the legislature proposes to subject it to any use which prior to the adoption of the constitution had not been considered a public use, you would have the question raised in the courts of the unconstitutionality of the statute, because it would be claimed that that was not a public use, but a private one. That is the point, and if you do not put such a provision as this in the constitution, you will be hung up by the holidays, so far as the complete development of all the resources of this state is concerned."

Further along in the debates, Judge Claggett said: "I would ask unanimous consent to insert after the words 'public use' the words 'to be subject to the regulation and control of the state.' If there is no objection, I will put it in. It is implied anyway, and you can put it in in specific terms, and then we will know who it is, who is going to have the power." Judge Claggett there refers to the "power." What power? Not the power to declare what a "public use" is, since that section of the constitution had already defined the meaning of "public use," but it was undoubtedly the power to provide proper procedure for the exercise of the right of eminent domain that he referred to. Mr. Heyburn asked: "Can the state delegate that power to the judiciary?" That is, the power to provide the procedure. Judge Claggett replied, "No." Further along Judge Claggett said: "The functions of the judiciary are merely interpretative. They can neither make laws nor limit laws; they interpret the law as they find it."

After the people in their constitution had declared what are public uses, it then devolved upon the legislature to provide a procedure for exercising the right of eminent domain or subjecting lands to such public uses. As stated by Judge Claggett, the power to exercise the right of eminent domain or to subject private property to a public use, "does not exercise itself," and "the machinery of the whole thing is left to the legislature." But it was not left to the legislature to declare the uses necessary to complete the develop-

ment of the material resources of the state, since that was done by the constitution.

Suppose the legislature by legislative enactment had declared that the great timber resources of the state were not material resources of the state, and had, as it has, enacted the necessary procedure for the exercise of the power of eminent domain, would not any such legislative declaration be held unconstitutional and void, since the people by their constitution have declared that any use necessary to the complete development of the material resources of the state is a public use? The legislature has no authority to declare that any use necessary to a complete development of the material resources of the state is not a *public use,* since the people themselves have declared in the constitution that such necessary use is a "public use."

Judge Standrod, in discussing said section (vol. 1, Const. Debates, pp. 295 and 296), said: "The object of this section is to declare what a public use is. . . . . It will prevent this question coming up hereafter because it positively defines what a public use is. That is the intention of it." Later in the discussion (p. 324) he said: "It certainly will not be contended that this convention has not the power—that the state has not the power to prescribe or define what a public use is, and that it is not in conflict with the constitution of the United States. We have made this definition in this section in order to settle this question and prevent wrangling over it in courts, because when these questions come up the first opposition we meet with is that it is unconstitutional, it is not a public use, and the court must say what a public use is."

Some of the members of the Constitutional Convention were in favor of restricting the provisions of said section 14 to mining and agriculture, and after stating that, Mr. Hampton, a member of the convention (at p. 1623, vol. 2), said: "I propose to consider that part which relates to any other useful or beneficial purpose, and leave the parts about mines and agriculture. That is the very reason why the constitution of Colorado is not what we want here; it is too nar-

row; it is not broad enough. We want something that will cover *every industry.* We don't want the legislature to favor agriculture and mining alone.''

In the adoption of said section it was evidently the intention of the framers to cover every material resource in the state, and it seems to us there can be no doubt, from a reading of the debates of said constitution, that it was the desire and intention to incorporate into the constitution a declaration, as was done, as to what constituted a public use and to define such use, and leave the legislature to provide the machinery or procedure to be pursued in condemning lands for those uses.

Counsel for respondent suggests that the people acting in harmony and in pursuance of the grant of power given them in sec. 14, art. 1, of the constitution, have spoken through the legislature in sec. 5210, Rev. Codes, where they have limited the exercise of the right of eminent domain to the public uses therein mentioned and provided.

That section of the statute was adopted by the territorial legislature as early as 1881 (Sess. L. 1881, p. 190), a number of years before the constitution of the state of Idaho was adopted. At that time that section did not specifically mention all of the necessary uses of lands declared to be a public use by said sec. 14 of the constitution. It did not specify ''reservoirs'' nor the ''storing of logs.'' Subd. 6 of that section only included ''telegraph lines,'' and by the amendment of 1903 it was made to include telephones and telephone lines, lines used in transmitting electricity for power, lighting, heating or other purposes. Is it to be contended that simply because the legislature neglected to specify the particular uses for which lands might be taken for a public use that it could nullify the plain provisions of the constitution which do specify such uses? We think not.

The great development of the timber resources of this state has occurred since 1903, and the fact that the legislature has failed to designate what *it* considered the material resources of the state can cut no figure in this case what-

ever, when we take into consideration the provisions of said section 14, article 1, of the constitution. Had it been the intention of the makers of the constitution to declare that the necessary use of lands for reservoirs, etc., was thereby declared to be a public use, and that any other use of lands necessary for the complete development of the material resources of the state may be declared to be a public use by the legislature, they would have used apt language for that purpose.

The right to declare what is a public use and for what purposes the right of eminent domain may be exercised is the right of the sovereign, or the right of the people, to so declare in their constitution, if they desire to do so, or that may be left to the legislature. In some states this power is exercised by the legislature by and with the consent of the people. Where the people have provided in their constitution in express terms for what purposes the right of eminent domain may be exercised and have defined what are public uses, that is an expression of the sovereign will and grants the right as effectually as if expressed in an act of the legislature, and that right can be enforced when such grant is supplemented by an act of the legislature providing the procedure and means for its exercise, regardless of whether the legislature repeats the provisions of the constitution in defining for what "public uses" the right of eminent domain may be exercised.

It is entirely competent for the people in their constitution to incorporate into it self-executing provisions. The procedure for ascertaining the rights of the parties in condemnation proceedings where a public use is involved, and to ascertain the compensation and to make the right of eminent domain available, has been fully provided by the legislature, while the purposes for which such right may be invoked is provided by the constitution. The legislature cannot interfere with or set at naught the specific provisions of the constitution in regard to what is a "public use," but it may add thereto other uses and declare them to be public.

In *Day v. Day,* 12 Ida. 556, 86 Pac. 531, 10 Ann. Cas. 260,

this court held that the legislature, neither by neglect to act nor by legislation, can nullify a mandatory provision of the constitution.

This court stated in *Potlatch Lumber Co. v. Peterson*, 12 Ida. 769, 118 Am. St. 233, 88 Pac. 426: "That it is enough if the taking tends to enlarge the resources, increase the industrial energies and promote the productive power of any considerable part of the inhabitants of a section of the state, or leads to the growth of towns and the creation of new channels for the employment of private capital and labor, as such results indirectly contribute to the general prosperity of the whole community."

In *Boston & Roxbury Mill Dam Corp. v. Newman*, 12 Pick. (Mass.) 467, 23 Am. Dec. 622, the supreme court of Massachusetts intimated the true rule in regard to manufacturing establishments, and in the course of the opinion asked the following pertinent question: "Is it nothing to the public that great numbers of citizens have the means of employment brought to their homes?" Is it nothing to the people of this state that great numbers of citizens have employment in the complete development of the timber resources of the state?

In *Scudder v. Trenton Delaware Falls Co.*, 1 N. J. Eq., 694, 23 Am. Dec. 756, the court said: "May we not, in considering what may be deemed a public use and benefit, look at the objects, the purposes and the results of the undertaking? . . . . The ever-varying condition of society is constantly presenting new objects of public importance and utility."

This is one of the cogent reasons why the main question involved here is more a judicial than a legislative one.

In *Great Falls Mfg. Co. v. Fernald*, 47 N. H. 444, the court said: "In no part of the world have the public a deeper interest in the success of all undertakings, which promise to assist in the development of these great natural advantages."

While it is true some of the cases above cited were under statutes authorizing the taking of private property for public use, it must be remembered that a statute is of no

more efficacy than is the declaration of the people in their constitution.

In *Clark v. Nash* (Utah), 198 U. S. 361, 25 Sup. Ct. 676, 49 L. ed. 1085, 4 Ann. Cas. 1171, Justice Peckham, in delivering the opinion of the court, said: "But whether a statute of a state permitting condemnation by an individual for the purpose of obtaining water for his land or for mining should be held to be a condemnation for a public use, and, therefore, a valid enactment, may depend upon a number of considerations relating to the situation of the state and its possibilities for land cultivation, or the successful prosecution of its mining or other industries."

See, also, *Strickley v. Highland Boy Gold Min. Co.*, 200 U. S. 527, 26 Sup. Ct. 301, 50 L. ed. 581, 4 Ann. Cas. 1174, where it was held that the mining industry of Utah is second only in importance to that of irrigation. The opinion in that case bears upon the case at bar.

See, also, *Helena Power Transmission Co. v. Spratt*, 35 Mont. 108, 88 Pac. 773, 8 L. R. A., N. S., 567, 10 Ann. Cas. 1055, which cites many authorities on the question herein involved, and quotes from *Ellinghouse v. Taylor*, 19 Mont. 462, 48 Pac. 757, as follows: "Persons have been allowed the right of eminent domain on the theory of a public use, in the construction of dams for the operation of grist and saw mills, in the reclamation of swamp-lands, and in other similar instances that might be enumerated, where the public had no direct interest in these operations, whose main end was mere private gain, and where the benefit to the people at large could result indirectly and incidentally only from the increase of wealth and the development of natural resources."

Counsel for respondent contend that the law provides appellant with ample means whereby it may organize a railroad company to construct whatever lines it may find necessary to enable it to reach all of the timber referred to in the complaint, but that the law does not permit a private appropriation of private property in the manner sought to be accomplished in this action, and cite in support of that contention, *Connolly v. Woods*, 13 Ida. 591, 92 Pac. 573, and *McLean v.*

*District Court,* 24 Ida. 441, Ann. Cas. 1915D, 542, 134 Pac. 536.

In the case of *Connolly v. Woods, supra,* the court referred to sec. 5 of art. 11 of the state constitution, which declares all railroads, transportation and express companies to be common carriers, and the court held that every railroad is made a public service corporation, and therefore entitled to exercise the right of eminent domain, and if it refuses to perform any of the duties that it owes to the public, it may be compelled to do so.

In the McLean case, *supra,* the court held that when a railroad is organized under the laws of the state as a railroad corporation and for public use, such railroad is governed by constitutional provisions and the statutes of the state; that railroads are public highways and common carriers, subject to legislative control.

No doubt, under the provisions of said section of the constitution, the logging railway proposed would be required to haul logs of other land owners along its line, provided such land owners delivered their logs to the railroad for transportation, but it could not be compelled to put on a passenger and express train, under the facts of this case. That section of the constitution refers more particularly to railroads that are constructed for general transportation and not to such a road as the one referred to in the complaint, to be constructed for removing the timber from 400 acres of land.

The facts alleged in the complaint, as we construe them, clearly indicate that the plaintiff and defendant own at least the greater part of the timber land in the gulch up which this logging road is sought to be built, and it may be inferred, at least, that there is no passenger or express traffic that would justify the building or maintenance of a railroad for any other purpose than marketing the timber tributary to said gulch.

Counsel for respondent also contends that until the people of Idaho speak through their legislature granting a private corporation the right to take private property for a temporary logging road, under the law no such right of appropria-

tion of private property can be enjoyed or exercised. Counsel again overlooks the fact, as already pointed out, that the people themselves have spoken in their constitution and have clearly provided that private persons or private corporations, if engaged in the development of the material resources of the state, to the end that their complete development may be made, may exercise that right. The necessary use of lands for that purpose is declared by the people themselves to be a public use.

What is the constitution of Idaho, anyway? It is the supreme law of the state formed by the mighty hand of the people themselves, in which certain fixed principles of fundamental law are established. It contains the will of the people and is the supreme law of the state. It is superior to and above the power of the legislature, and can be revoked, nullified or altered only by the authority that made it. The lifegiving principle in that instrument proceeded direct from the people, and the death-dealing stroke, when given, must proceed from the same power. In the constitution the people have said to the legislature, "Thus far ye shall go and no farther," and the people have declared that the right of eminent domain may be invoked wherever it is necessary to the complete development of the material resources of the state, and any act of the legislature that would prohibit the exercise of that right for such complete development would be unconstitutional and void.

No legislative authority is needed under the provisions of section 14 of the constitution to invoke the power of eminent domain, further than to provide the judicial procedure for the exercise of that right or power, which procedure the legislature has amply supplied.

In 15 Cyc., p. 567, it is said that the right of eminent domain lies dormant in the state until legislative action is had pointing out the occasion, mode, conditions and agencies for its exercise. The authorities cited in support of that statement are from states not having constitutional provisions such as are contained in said section 14 of our constitution, but from states where the whole subject of eminent domain

was left to the legislature. The constitutions of such states, however, usually prohibited the taking of private property for a public use until a just compensation had been paid therefor. But the people of this state have determined the "occasions" and "conditions" on which the "right may be exercised," and only have left to the legislature the right or authority to fix the "mode" and "agencies for its exercise"; in other words, to provide the procedure whereby the right may be exercised. The same statement is made in Cooley on Constitutional Limitations, p. 259, and the author in 15 Cyc. 569, cites Cooley and other authorities in support of the statements therein made. Those statements are correct in all states where the people have not exercised their sovereignty and declared what uses are public in their constitutions, as the people have done in this state. The people in this state left to the legislature the authority only to provide the procedure, so far as the uses provided for by said section 14 are concerned.

The history of this state, as well as the allegations of the complaint, clearly show that the timber of the state is one of its great material resources; that much of the timber is ripe and ready to be marketed or for manufacture, and the mountainous conditions of the state make much of it almost inaccessible, and unless logging railways are permitted to be constructed, by means of which the timber may be delivered to the mills at a reasonable expense, the complete development of this great material resource cannot be made. And the individual owning only 400 acres of timber, if it is so situated that it requires the construction of a logging railway to transport it to the market, if he desires to go to the expense of constructing such a railway, may exercise the right of eminent domain to procure the right of way for such road.

Counsel for respondent contends that the taking of this property is confiscation. Such is not the case. The law provides that full compensation must be paid for such right of way. There is no element of confiscation involved in the case, since the full value of the right must be paid, under the law, before the land for the right of way can be taken. The value

of the land so taken is fixed by the court, a jury or commissioners, and it certainly is not confiscation when one gets full value for his land, for its temporary or other use, in the exercise of the right of eminent domain by the condemnor.

Because of the topography and mountainous conditions of the state, the needs of the people and the welfare of the people of large sections of this state depend upon the timber industry. Roads, tramways and logging roads are as necessary to the development of this great industry as are ditches to the development of the arid regions of the state, or tunnels and shafts to the development of the mines; and by the provisions of said sec. 14, art. 1, of the constitution, the people did not make, and did not mean to make, any discrimination between the great timber industry and the mining or irrigation industry of the state.

We therefore hold that the courts have the authority to determine the question of the necessary use of lands to the complete development of the material resources of the state, since such use is declared to be a "public use" by the provisions of said sec. 14 of the constitution, and that the legislature has provided the procedure for the determination of all questions connected with the exercise of the right of eminent domain.

We therefore conclude that the judgment of the trial court must be reversed and the cause remanded, with instructions to overrule said demurrer and permit the defendant to answer. Costs awarded to respondent.

Budge, J., concurs in the conclusion reached.

MORGAN, J., Dissenting.—As I view this case, the most important question presented by it is whether the courts or the legislature shall determine under what circumstances the power of eminent domain, reserved to the state by the general provision of sec. 14, art. 1, of the constitution, shall be invoked. This general provision follows the designation of certain specified uses for which private property may be taken, and reads, "or any other use necessary to the com-

plete development of the material resources of the state, or the preservation of the health of its inhabitants, is hereby declared to be a public use, and subject to the regulation and control of the state.'' In other words, who shall say, the legislature or the courts, what are and what are not the material resources of the state? What is and what is not necessary to be taken in order to bring about the complete development of these material resources and to preserve the health of the inhabitants of Idaho? In which branch of the government is the ''regulation and control of the state'' reposed? There can be but one logical answer to these questions. That power is vested in the legislature, and the members of the constitutional convention so understood and so intended.

There were some excellent lawyers in that convention and, as such, they must have known the universal rule to be: ''That the right to appropriate private property to public use lies dormant in the state, until legislative action is had, pointing out the occasions, the modes, conditions and agencies for its appropriations'' (Cooley's Const. Lim., 7th ed., 759), and they had a right to believe that those who came after them, to place an interpretation upon the constitution, would be familiar with that fundamental rule and would be governed by it. Furthermore, the constitutional convention was a legislative body and could not have mistaken itself for a court. It formulated and submitted to the sovereign people of Idaho, for their ratification or rejection, a constitution, and by so doing performed a legislative act of the highest order, thereby recognizing that eminent domain was a legislative rather than a judicial function, and therein expressly provided for the taking of private property for uses appertaining to the mining and agricultural industries which had to do, at that time, with the material resources of the state.

In 1889 timber was not deemed to be a material resource, and during the decade following the adoption of the constitution timber, growing upon thousands of acres of land in Idaho, was destroyed in order that the land might be reduced to a state of cultivation. The framers of our constitution, by

their legislative act of incorporating the *specific* provisions in sec. 14, art. 1, took care of such industries as appertained to the resources then material to the well-being of Idaho, and, by the *general* provision above quoted, placed it within the power of the legislature, as other industries developed and as other resources became material, to provide that private property might be taken under the power of eminent domain in aid of them. Had it been the idea of the framers of the constitution that the power of eminent domain should be invoked by the courts in aid of private enterprise, it would have submitted to the people of Idaho, for their approval, only the portion of the section hereinabove quoted and would not have itself undertaken to legislate upon the subject in behalf of developing resources of the state then deemed to be material.

Not only was the general rule that it is within the legislative, and not the judicial, power to designate the uses and purposes, the interests and industries, for and on behalf of which eminent domain may be invoked, recognized and acted upon throughout the United States at the time our constitution was proposed and adopted, but it had been the subject of legislation in the territory of Idaho, and sec. 5210, Rev. Stats., of the territory (which is now, as amended, sec. 5210, Rev. Codes) designated the public uses in behalf of which the power of eminent domain might be exercised, and that convention proposed and the people of Idaho adopted sec. 2 of art. 21 of the constitution, which is as follows: "All laws now in force in the territory of Idaho, which are not repugnant to this constitution, shall remain in force until they expire by their own limitation or be altered or repealed by the legislature." No stretch of the imagination can make sec. 5210, Rev. Stats., repugnant to sec. 14, art. 1, or any other provision of the constitution, and it was therefore the intention of the constitutional convention to not only recognize the power to designate the use on behalf of which eminent domain might be invoked as a legislative, and not a judicial power, but it was expressly provided that legislation already had upon the subject should be continued in full force and effect until —not the courts—the state legislature, thereafter to be assem-

bled, should see fit to change it. Whether or not it will, as stated in the majority opinion, be conceded "that the courts are better equipped to investigate and determine whether a logging railroad is necessary to the 'complete development' of the timber resources of the state," it is perfectly apparent the constitutional convention did not think so and, therefore, left that power with the branch of the state government nearest and most responsive to the sovereign people.

Nor can I concur in that statement made in the majority opinion to the effect that the legislature, recognizing the superior efficiency of the courts in this behalf, "has not attempted, since the adoption of the constitution, to specify by name or define what are the many material resources of the state that cannot be 'completely developed' without the exercise of the right of eminent domain." I find that in 1903 (Sess. Laws 1903, p. 203) the legislature amended sec. 5210, Rev. Stats., by adding to it the following public uses on behalf of which eminent domain may be exercised, to wit, electric railroads, reservoirs for public transportation, supplying mines and farming neighborhoods with water, and draining and reclaiming lands, and for storing and floating logs and lumber on streams not navigable; also telephones and lines used in transmitting electric current for power, lighting, heating or other purposes, and caused said section to read as follows: "Subject to the provisions of this title, the right of eminent domain may be exercised in behalf of the following public uses: 1. Public buildings and grounds for the use of the state, and all other public uses authorized by the legislature; 2. Public buildings and grounds for the use of any county, incorporated city, village, town, or school district; canals, aqueducts, flumes, ditches, or pipes for conducting water for the use of the inhabitants of any county, incorporated city, village or town or for draining any county, incorporated city, village or town, raising the banks of streams, removing obstructions therefrom and widening, deepening, or straightening their channels, roads, streets, alleys, and all other public uses for the benefit of any county, incorporated city, village, or town or the inhabitants thereof; 3. Wharves,

docks, piers, chutes, booms, ferries, bridges, toll-roads, by-roads, plank and turnpike roads, steam, electric and horse railroads, reservoirs, canals, ditches, flumes, aqueducts and pipes, for public transportation, supplying mines and farming neighborhoods with water, and draining and reclaiming lands, and for storing and floating logs and lumber on streams not navigable; 4. Roads, tunnels, ditches, flumes, pipes and dumping places for working mines; also outlets, natural or otherwise, for the flow, deposit, or conduct of tailings or refuse matter from mines; also, an occupancy in common by the owners or possessors of different mines of any place for the flow, deposit or· conduct of tailings or refuse matter from their several mines; 5. By-roads leading from highways to residences and farms; 6. Telephone, telegraph and telephone lines, and lines used in transmitting electric current for power, lighting, heating or other purposes; 7. Sewerage of any incorporated city." I further find that by chap. 108, Sess. Laws 1913 (p. 429), the legislature amended sec. 5229, which was as follows: "Nothing in this Code must be construed to abrogate or repeal any statute providing for the taking of property in any city or town for street purposes," and caused that section to read: "Nothing in this Code must be construed to abrogate or repeal any statute provided for the taking of property in any city or village for street purposes: Provided, That any city or village, at its option, may exercise the right of eminent domain under the provisions of Part 3, Title 7 of Revised Codes of Idaho for any of the uses and purposes mentioned in Subdivisions Twenty-sixth and Twenty-seventh of Section 2238 of the Revised Codes of the State of Idaho as amended by Chapter 81 of the Laws of the Eleventh Session of the Legislature of Idaho, approved March 13, 1911, in like manner and to the same extent as for any of the purposes mentioned in Section 5210 of said Revised Codes of Idaho." Upon the other hand, I find that the courts have not, heretofore, sought to invade the legislative province and to designate, without statutory authority, what shall and what shall not be subject to the power of eminent domain, but that the legislative power in these matters has been recog-

nized, either expressly or by implication, in the following Idaho cases: *Latah County v. Peterson,* 3 Ida. 398, 29 Pac. 1089, 16 L. R. A. 81; *Hollister v. State,* 9 Ida. 8, 71 Pac. 541; *Potlatch Lumber Co. v. Peterson,* 12 Ida. 769, 118 Am. St. 233, 88 Pac. 426; *Village of Twin Falls v. Stubbs,* 15 Ida. 68, 96 Pac. 195; *Portneuf Irrigating Co. v. Budge,* 16 Ida. 116, 100 Pac. 1046, 18 Ann. Cas. 674; *Washington Water Power Co. v. Waters,* 19 Ida. 595, 115 Pac. 682; *Idaho-Western Ry. Co. v. Columbia Conference etc. Synod,* 20 Ida. 568, 119 Pac. 60, 38 L. R. A., N. S., 497; *Thomas v. Boise City,* 25 Ida. 522, 138 Pac. 1110, and *Idaho-Iowa Lateral etc. Co. v. Fisher,* 27 Ida. 695, 151 Pac. 998.

The case of *Latah County v. Peterson,* above cited, arose immediately after the adoption of the Idaho constitution, and the opinion of the court, in that case, was written by the late Justice John T. Morgan, who was a member of the Constitutional Convention. The court then recognized the rule "that the right to appropriate private property to public use lies dormant in the state until legislative action is had, pointing out the occasions, the modes, conditions, and agencies for its appropriation," for it said: "The constitution (article 1, section 14) substantially recognizes the right of the legislature to provide for laying out private roads or by-ways," and compared our statute upon that subject to those of other states, and held that by reason of the provision therein that a private road, when opened, can be used for any purpose to which it is adapted, by the general public and by any individual thereof, the taking in that case was not for a private, but for a public, use, and did not violate the constitution.

In case of *Hollister v. State,* the court recognized the validity of sec. 5212, Rev. Stats. 1887 (sec. 5212, Rev. Codes), which indicates what private property may be taken under the power of eminent domain, and sec. 13 of an act of the legislature approved February 25, 1899 (Sess. Laws, 1899, p. 381), providing that the right of way over and upon any and all lands owned and controlled by the state of Idaho is granted for certain purposes therein enumerated, and further providing that no property shall be taken under the provi-

sions of said section until full compensation shall be paid therefor, to be ascertained in the manner prescribed by law for the taking of private property for a public use. In that case the court concluded: "We have examined the entire record, and are fully satisfied that the use for which the lands are claimed is a public use, as defined by sec. 5210, of the Revised Statutes, and section 14 of article 1 of the state constitution."

In case of *Potlatch Lumber Co. v. Peterson,* this court, after stating that appellants demurred to the complaint on the ground that it did not state a cause of action, and relied upon two propositions of law in order to support the demurrer: 1. That the taking of said land was not for a public use; and 2. That the statutes of Idaho were not sufficiently broad to cover such use, quoted at considerable length from sec. 5210, Rev. Codes, and said, in addition to the portions of that opinion quoted here by the majority of the court: "The legislature well knew that many of our streams were floatable for logs in places, and not in others; it had in view those streams in the enactment of sec. 5210, and it intended to and did grant the right to exercise the power of eminent domain in order to make such streams floatable at places where they were not floatable unless improved by dams or otherwise." In that case the court also said:

"*In limine,* we shall make a few observations upon the power of eminent domain. That power is an incident of sovereignty inherent in the federal government and the several states by virtue of their sovereignty. This power with all its incidents is vested in the legislatures of the several states. (1 Lewis on Eminent Domain, sec. 237; Cooley's Constitutional Limitations, 7th ed., 755; *Hollister v. State,* 9 Ida. 8, 71 Pac. 541.)"

If the paragraph last above quoted was the law in 1906, when it was written by the author of the majority opinion in this case, since there has been neither constitutional amendment nor legislative enactment on the subject between now and then, the query is invited: When and how was it changed? It undoubtedly contains a correct statement of the rule that

the power of eminent domain, *with all its incidents,* is vested in the legislatures of the several states, and, while the decision of the court in *Potlatch Lumber Co. v. Peterson* possesses some legislative excuse in sec. 5210, *supra,* the majority opinion in this case has none.

I have never been in entire accord with the opinion of the court in case of *Potlatch Lumber Co. v. Peterson,* especially with that portion of it expressed in the tenth and eleventh paragraphs of the syllabus which state: "10. The term 'public use,' as used in said section 14, article 1, of the constitution, means public usefulness and productive of general benefit. That term is a flexible one, and necessarily has been of constant growth as new public uses have developed. 11. The power of eminent domain under our constitution and laws is given a degree of elasticity, thus making it capable of meeting new conditions and improvements of the ever-increasing necessities of society."

My theory has always been that our constitution cannot be amended except, as therein provided, by the sovereign people, and not by the courts. That case and this one have a tendency to invite the inquiry: Does judicial construction ever reach a point where it ceases to be constitution stretching and becomes law breaking?

*Village of Twin Falls v. Stubbs* was a case wherein the village, now city of Twin Falls, sought to condemn certain lands for purposes of a sewer system. This court in that case, in sustaining the right of the municipality to invoke the power of eminent domain, based its decision and opinion upon the act of the legislature approved February 24, 1905 (Sess. Laws 1905, p. 335), authorizing and empowering cities, towns and villages to construct and maintain sewer systems and to condemn land for that purpose, and upon subdivision 2, sec. 5210, Rev. Stats., as amended by the act of March 3, 1903 (Sess. Laws 1903, p. 203).

The case of *Portneuf Irr. Co. v. Budge* grows out of another case wherein one irrigation company sought to condemn a portion of the canal and right of way of another for the purpose of so enlarging the canal as to not only carry the

volume of water owned and used by its owner, but also such additional volume of water as would be necessary for the uses and purposes of the company seeking condemnation. The right to take private property for the uses therein sought is expressly recognized as being provided for, not only in sec. 14, art. 1, of the constitution, but by the legislature. In that case this court said: ''The constitutional provision with reference to the exercise of the power of eminent domain is a limitation upon the power and authority of the legislature to act in this matter, and cannot be viewed or construed as a grant in any respect. The power of eminent domain adheres in sovereignty as an essential element thereof and cannot be alienated. (Lewis on Eminent Domain, secs. 10, 237.) Primarily, the power and exercise of this right for and on behalf of the state rests with the legislature. That body may determine the necessity for the taking, and its determination thereon is final. In this state, however, that power has been delegated by the legislature through general statutes defining the uses for which property may be taken, and vesting in the courts the jurisdiction and authority to determine when the use falls within any of the enumerated classes, and also as to when the necessity for the taking arises.'' The case at bar differs from the Portneuf Irr. Co. case in this, that no statutory provision has been made for taking private property for the purposes herein sought to appropriate it, nor have these purposes been specified by the constitution as appertaining to the material resources of Idaho, so that in this case the general statutes, mentioned in that decision as vesting in the courts the jurisdiction and authority to determine when the use falls within any of the enumerated classes, and also as to when the necessity for the taking arises, do not apply.

The case of *Washington Water Power Co. v. Waters* was between the same parties, and grew out of the same state of facts as that cited and quoted from at length in the majority opinion appearing in 186 Fed. 572. That case was one wherein Washington Water Power Company was seeking to condemn the lands of certain riparian owners for reservoir purposes in order to increase the capacity of Coeur d'Alene

Lake and its tributaries, with the end in view of generating electrical power to be used in lighting municipalities, operating railroads, and numerous other public uses, and is a purpose expressly provided for by our constitution and statutes heretofore frequently referred to. In that case this court said: "As we said in the Hollister case, we repeat here, that the use for which the land is sought to be taken in this case is clearly a public use within the provisions of sec. 14, art. 1, of the constitution and the provisions of sec. 5210, Rev. Codes. Our determination of the first question as above announced renders it unnecessary to deal in this opinion with the other question that has been raised. Whether the ascertainment and determination that any use other than those specifically enumerated is 'necessary to the complete development of the material resources of the state' is a legislative or a judicial question, becomes immaterial in this case." Since Judge Dietrich's opinion, above referred to, was based upon a state of facts identical with those of the case from which quotation was last above made, this decision, by our own supreme court, rendered subsequent to that of Judge Dietrich, disposes of that opinion as an authority upon the question here under consideration, as it would seem to classify his observations, now relied upon by the majority of the court, as *obiter dictum*.

The case of *Idaho-Western Ry. Co. v. Columbia Conference etc. Synod* was an action to condemn lands for a railroad right of way. The court in that case again recognized the legislative authority in matters of eminent domain, and said: "The statute requires the condemnor to disclose the purpose for which he is seeking to condemn the property, and the general nature and character of the improvement or structure he expects to erect in order to bring himself within the constitution and statute. (Sec. 14, art. 1, Const; sec. 5210, Rev. Codes.)"

In case of *Thomas v. Boise City*, wherein an attempt was made to condemn property for street purposes under the provisions of sec. 2238, Rev. Codes, this court, recognizing the necessity for legislative authority in condemnation proceed-

ings in addition to those conferred by the general provisions of sec. 14, art. 1, of the constitution, said: "Sec. 2238, subds. 26 and 27, provides no method for condemning real property to public use under art. 1, sec. 14, of the constitution of this state, and has no force in the proceedings in this case, because there is no provision in either subdivision, or any other provision, that provides for the condemnation proceedings attempted to be enforced as shown by the record in this case."

While, in case of *Idaho-Iowa L. etc. Co. v. Fisher,* Mr. Justice Budge dissented from the conclusion reached by the court, upon the ground that title to the school land therein involved had not, in his opinion, passed to appellant as provided by law, and while the author of this dissenting opinion agreed with him that the right, or power, of eminent domain was not involved in that case, the chief justice placed an interpretation upon the language of the constitution providing that the necessary use of lands for certain purposes "is hereby declared to be a public use and subject to the regulation and control of the state," which did not invoke the disapproval of any member of the court, and should set the troublesome question involved herein forever at rest, which is: Which branch of the state government is intended to exercise that regulation and control? It is said in the opinion last above mentioned: "Sec. 14, art. 1, of the constitution does not provide that the fee-simple title for state lands used as reservoirs must be taken, but does provide that 'The necessary use of lands for the construction of reservoirs' shall be 'subject to the regulation and control of the state,' meaning thereby that such matters shall be controlled by the legislature of the state by legislative enactment."

There can be no doubt that the foregoing quotation is a correct statement of a sound rule of law, and, applied to this case, it means that since the legislature has made no provision for the taking of private property for the use to which respondent's property is sought to be applied; it cannot be taken under the power of eminent domain.

If there was specific statutory or constitutional authority for taking the land here sought to be taken under the power

of eminent domain, for the use to which it is desired to put it, the demurrer in this case would have been properly sustained, for the complaint would not, even then, state facts sufficient to constitute a cause of action.   The purpose for which this right of way is sought to be condemned is that a temporary logging railroad may be constructed across the land of respondent to the land of appellant, in order that it may transport certain timber which is situated thereon to its mills for manufacture.   Paragraph 5 of the complaint describes, by legal subdivisions, 400 acres of land which, it is alleged, is owned by appellant and which, it appears, is sought to be reached by this logging railroad.   The quantity and value of this timber is thus described in paragraph 5, and not otherwise in the complaint: "That situated upon said lands above referred to are quantities of valuable timber which the plaintiff desires to transport to its mills for manufacture."

We are not informed how numerous or how extensive are these quantities, whether large or small, many or few, nor are we enlightened as to how valuable is the timber or for what purpose it is valuable, whether for lumber, railroad ties, cordwood, fishing poles or Christmas trees.   Still this court is asked to infer from this meager allegation, and the majority of the court does infer, that the removal of this timber will, in the language of the constitution, "develop the material resources of Idaho."   I do not believe it was intended by the framers of the constitution that sacred property rights should be invaded except for the purpose of promoting the material welfare of the people of this state to a perceptible and substantial degree, and there is nothing in this complaint to indicate that the wealth or well-being of the people of Idaho, or of any of them, will, by the taking of this private property, be augmented to the value of a single dime.

It is said in 15 Cyc. 567: "Inasmuch as the right of eminent domain is one which lies dormant in the state until legislative action is had pointing out the occasion, mode, conditions, and agencies for its exercise, the right to exercise the power must be conferred by statute, either in express words or by neces-

sary implication. The power should not be gathered from doubtful inferences, but should be unmistakably expressed.

"The power of eminent domain being in derogation of the common right, acts conferring it are to be strictly construed and are not to be extended beyond their plain provisions. The right to exercise the power is strictly limited to the purposes specified in the statute conferring it. The proposed use of the lands of the owner must be clearly embraced within the legitimate object of the power conferred. Where there is any doubt in regard to the extent of the power the land owner must have the benefit of that doubt. Statutes conferring the power of eminent domain on private corporations do not render compulsory or obligatory the exercise of those powers."

Not only can I find no legislative authority to invoke the power of eminent domain in this case, but it appears to me the attempt to do so is an effort on the part of appellant to pervert the good intentions of the framers of the constitution.

Petition for rehearing denied.