# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 39466-2011

| | | |
|---|---|---|
| TELFORD LANDS LLC, an Idaho Limited Liability Company; MITCHELL D. SORENSEN, an individual; and PU RANCH, a general partnership, | ) ) ) ) | Pocatello, May 2013 Term |
| | ) | 2013 Opinion No. 73 |
| Plaintiffs-Respondents, | ) ) | Filed: June 20, 2013 |
| | ) | |
| v. | ) ) | Stephen W. Kenyon, Clerk |
| DONALD WILLIAM CAIN and CAROLYN RUTH CAIN, husband and wife, | ) ) ) | |
| | ) | |
| Defendants-Appellants. | ) ) | |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, in and for Butte County. The Hon. Joel E. Tingey, District Judge.

The judgment of the district court is <u>affirmed in part</u> and <u>vacated in part</u>.

Gary D. Slette, Robertson & Slette, Twin Falls, argued for appellants.

Robert L. Harris, Holden Kidwell Hahn & Crapo, Idaho Falls, argued for respondents.

---

EISMANN, Justice.

This is an appeal out of Butte County from a judgment condemning an easement across the appellants' real property for an irrigation pipeline installed by the respondents so that they can save water by avoiding the conveyance losses that occurred while using the Moore Canal to transport their water. We affirm the judgment as to the right to condemn the easement, direct the court to modify the easement as to one party, and vacate the dismissal of appellants' counterclaim.

## I.
## Factual Background.

Telford Lands LLC, Mitchell D. Sorensen, and PU Ranch ("the Ranchers") are each owners of farmland in an area of Butte County known as the Era Flat, and they each have both surface water and groundwater rights to irrigate their respective farmlands. Mike Telford leases the property of Telford Lands. Telford Lands has an irrigation well on its property known as the Burnett Well, Mr. Sorensen has an irrigation well on his property known as the Old Moss Well, and PU Ranch has an irrigation well on its property known as the PU Well. Prior to 2009, PU Ranch and Mike Telford each pumped groundwater from their respective wells into the Moore Canal, owned by the Big Lost River Irrigation District, in order to transport the water to their respective authorized places of use. They each had entered into transport agreements with the Irrigation District, which permitted them to use the canal to transport their water. Their water was comingled with the District's water as it flowed down the canal, and due to conveyance losses the amount of water they could divert back out of the canal was substantially less than the amount they pumped into the canal.

In the spring of 2009, the Ranchers joined together to construct pipelines to convey water from their respective wells to a ditch they constructed in an unused portion of a canal known as the Blaine Canal. The water then flowed to a portion of the Blaine Canal that was still in use, known as the Timberdome Canal, which conveyed the water to the Ranchers' respective farmlands. They did so to avoid having to use the Moore Canal because of the high conveyance losses of water as it flowed down the canal. This lawsuit involves the condemnation of an easement to run the buried pipeline across a strip of real property owned by Donald and Carolyn Cain.

The Ranchers built two separate pipelines. One pipeline has one branch beginning at the PU Well and running in a southwesterly direction to a point south of the Sorensen property where it connects to the other branch running south from the Old Moss Well. The pipeline then continues in a southwesterly direction to a point where it crosses a 100-foot-wide strip of land owned by the Cains. After crossing the Cains' property, it goes under Highway 93, which runs north-south, and then near the Burnett Well. The second pipeline begins at that well, and then both pipelines continue parallel to each other in a southwesterly direction to the ditch in the Blaine Canal.

The Ranchers contend that Mr. Cain gave them oral permission to run the pipeline across the Cains' property, but in August 2009 the Cains began protesting the pipeline across their

property. The Ranchers attempted to purchase an easement from the Cains, but Mr. Cain demanded more than $100,000 for the easement. In May 2010, he dug up the pipeline on his property, punched a hole in it to disable it, and then sent a letter to the Ranchers informing them about what he had done.

On May 17, 2010, the Ranchers filed this action seeking: (1) specific performance of the alleged oral agreement to permit them to construct the pipeline across the Cains' property; (2) a finding that the Cains were estopped from forcing removal of the pipeline; (3) damages for a civil conspiracy among Mr. Cain and the unknown person(s) who assisted him in digging up and damaging the pipeline; (4) condemnation of an easement across the Cains' property for the pipeline; (5) damages for injury to the pipeline, including crop losses. On May 25, 2010, the Cains filed an answer and a counterclaim for trespass.

The Ranchers filed a motion for partial summary judgment regarding their condemnation claim, and the Cains filed a motion for summary judgment seeking dismissal of all of the Ranchers' claims. The district court granted the Ranchers' motion, and it granted the Cains' motion with respect to the Ranchers' remaining claims. The issue of damages for the taking of the Cains' property was set for trial. Prior to filing this lawsuit, the Ranchers had offered the Cains amounts ranging from $500 to $5,000, but the Cains refused those offers and demanded more than $100,000 for an easement. In preparation for the trial, the Ranchers engaged a certified appraiser to provide an opinion as to the value of the property to be condemned. The land subject to the easement was an old railroad right-of-way that the Cains had purchased in 1995, but which had remained unused. The appraiser determined that such land had a value of $27.55. Because of the low value, he concluded that the easement would have "a token value of $500," which "would represent the time and effort required for the property owner to sign an easement." The Cains ultimately stipulated to that amount as their damages for the condemnation of the easement.

The Cains filed a motion for reconsideration of the district court's decision granting the Ranchers' motion for a partial summary judgment on their condemnation claim, and the Cains presented additional evidence in support of the motion. After hearing argument, the district court denied the motion for reconsideration. Both sides requested an award of court costs and attorney fees, but the district court denied both requests on the ground that there was no prevailing party.

3

The district court entered a final judgment on September 30, 2011, and the Cains timely appealed.

## II.
### Were the Cains Denied Due Process of Law?

The Ranchers installed the pipeline across the Cains' property in May or June of 2009. According to the Ranchers, they had received oral permission from Mr. Cain to do so, but he later changed his mind as a result of pressure from others who wanted the Ranchers' water to be in the Moore Canal. The Cains contend that they were denied due process of law as a result of the Ranchers constructing the pipeline across the Cains' property before the amount of just compensation owing to the Cains was determined and paid in the manner provided by law. They rely upon the last sentence of Article I, § 14, of the Idaho Constitution, which states, "Private property may be taken for public use, but not until a just compensation, to be ascertained in the manner prescribed by law, shall be paid therefor." They argue that because the Ranchers were in possession of the Cains' land before instituting condemnation proceedings, "the decision of the district court on the issue of eminent domain should be vacated with instructions to the district court to enter a judgment in favor of the Cains on the trespass claim they asserted in their Counterclaim."

Assuming that the Ranchers committed a trespass when they installed the pipeline across the Cains' real property, they would not be barred from thereafter instituting proper condemnation proceedings. If a person or corporation vested with the power of eminent domain enters upon the land of another without lawful authority, the person or corporation may, by proper proceedings, still condemn the property wrongfully entered upon. *Blackwell Lumber Co. v. Empire Mill Co.*, 29 Idaho 421, 434, 160 P. 265, 269 (1916).

The Cains are correct that "under the provisions of the constitution private property may be taken for public use, but not until just compensation, ascertained in a manner prescribed by law, shall be paid therefor." *Big Lost River Irr. Co. v. Davidson*, 21 Idaho 160, 168, 121 P. 88, 91 (1912). However, in *Yellowstone Pipe Line Co. v. Drummond*, 77 Idaho 36, 287 P.2d 288 (1955), we held that where the installer of a pipeline across the property of another did not do so by forcible entry or by deliberate trespass, but under a belief that the installer had the right to do so, "it would be inequitable and cause unnecessary damage to require respondent to dig up its

4

pipeline and surrender possession of the right-of-way pending the final determination of this cause." *Id.* at 44, 287 P.2d at 293. In this case, there is an issue of fact as to whether Mr. Cain initially gave the Ranchers oral permission to install the pipeline across the Cains' property. However, that issue of fact is immaterial to the resolution of this issue on appeal.

If a private person, who is entitled under Article I, § 14, to condemn an easement across the property of another, enters onto the property without first obtaining an order of condemnation and paying just compensation, the owner of the property "may maintain his action to oust and eject the trespasser, or he may enjoin him from using and occupying the land, or he may waive both such remedies and sue upon an implied contract to pay reasonable compensation for the property taken." *Boise Valley Constr. Co. v. Kroeger*, 17 Idaho 384, 397, 105 P. 1070, 1074 (1909). In this case, the Cains did not raise this issue until after the judgment was entered in this case and they had filed their notice of appeal. They raised it in their reply brief in support of their motion to disallow the Ranchers' request for an award of court costs and attorney fees. Because they did not raise this issue in the district court until after the judgment for condemnation was entered, they waived it.

## III.
### Did the District Court Err in Holding that There Was a Reasonable Necessity Required for Condemnation of an Easement?

In *Erickson v. Amoth*, 99 Idaho 907, 591 P.2d 1074 (1978), this Court upheld the dismissal of an action by private parties to condemn a road right-of-way across the defendants' property because the private parties had failed to prove that "the alternative means of access were not available to them or that such means of access were not reasonably adequate or sufficient for their purposes." *Id.* at 910, 591 P.2d at 1077. Relying upon *Erickson*, the Cains argue that the Ranchers had an alternative means of transporting their water through the Moore Canal, which they or their predecessors had used for thirty years. They also assert that the Ranchers voluntarily terminated their transportation agreements with the Irrigation District and that they cannot create the necessity for condemning an easement for their pipeline.

The Cains rely upon an agreement reached between the Ranchers and the Irrigation District to resolve a separate lawsuit. When the Ranchers were constructing their pipeline, they needed to cross Highway 93. In order to do so, the Ranchers located a culvert that was nearly

5

entirely filled with sediment, which they concluded to be abandoned. After obtaining permission from the Idaho Transportation Department, they cleaned out the culvert and ran the pipeline through it. When the District discovered the pipeline, it removed the portion that ran through the culvert, contending that it owned the culvert. It also asserted ownership of that portion of the Blaine Canal where the Ranchers had constructed the ditch into which their pipeline discharged. The Ranchers slightly rerouted the pipeline and drilled under the highway to install pipe there rather than use the culvert, and they sued the Irrigation District to resolve the ownership of the unused portion of the Blaine Canal. To settle that lawsuit, the Ranchers and the Irrigation District entered into a written agreement dated June 30, 2009. That agreement included a provision that the Irrigation District would quitclaim to the Ranchers an easement in the Blaine Canal for their ditch and that the transport agreements of Mike Telford and PU Ranch for their respective water rights at issue would terminate on December 31, 2009. Mr. Sorensen had never applied for a transport agreement for the groundwater he pumped into the pipeline, but his predecessor in interest had used the Moore canal to transport water. The settlement agreement also contained a provision stating that the termination of the two transport agreements "has no impact or effect on existing transports [sic] agreements held by the [Ranchers] for other surface and ground water rights; both within the Moore Canal and elsewhere within the [Irrigation District] system."

The Cains argue that Mike Telford and PU Ranch voluntarily gave up their respective transport agreements and that they should not be able to create the necessity for condemning an easement by voluntarily giving up the alternative means for conveying their water. The Cains also argue that although Mr. Sorensen never applied for a transport agreement with respect to the water rights at issue, he should not be able to condemn an easement where another method of transporting his water is available. Finally, the Cains point out that the Ranchers have transport agreements with the Irrigation District for other water rights and that after the pipeline was installed Mike Telford entered into a transport agreement with the Irrigation District in 2010 to transport water from a well he co-owns with another to the same cropland being served by the pipeline. The Cains assert that the fact that the Ranchers have transport agreements for other water rights shows that the Moore Canal is a reasonable and available alternative means for transporting the water at issue.

6

There is conflicting testimony as to whether the Ranchers or the Irrigation District demanded a provision in the settlement agreement that Mike Telford's and PU Ranch's transport agreements would terminate on December 31, 2009. There is also conflicting testimony as to whether the Irrigation District would enter into new transport agreements for the water that the Ranchers pump into the pipeline. In addition, the sources of the water that the Ranchers still transport by way of the Moore Canal are from locations different from those involved in this case, and there is no showing that water from those locations could reasonably be transported through the pipeline. Because this case was decided on summary judgment, we must assume that Mike Telford and PU Ranch wanted to terminate their transport agreements and that the Irrigation District would enter into transport agreements with the Ranchers if they applied.

Article I, § 14 of the Idaho Constitution authorizes the taking of private property for public use. "As to irrigation . . . , the section itself shows . . . that it confers the right to condemn for individual use on the theory that the development of individual property tends to the complete development of the entire state." *Codd v. McGoldrick Lumber Co*., 48 Idaho 1, 10, 279 P. 298, 300 (1929). It declares to be a public use, subject to the regulation and control of the state, "[t]he necessary use of lands . . . for rights of way for the construction of canals, ditches, flumes or pipes, to convey water to the place of use for any useful, beneficial or necessary purpose." Idaho Const. Art. I, § 14. The use of water for irrigation purposes is a beneficial use of the water. *United States v. Pioneer Irr. Dist.*, 144 Idaho 106, 110, 157 P.3d 600, 604 (2007); *Reno v. Richards*, 32 Idaho 1, 14, 178 P. 81, 86 (1918) (irrigation of natural grasses is a beneficial use); *Conant v. Jones*, 3 Idaho 606, 613, 32 P. 250, 251 (1893) (irrigation of cultivated crops). The right of eminent domain may be exercised for pipelines conducting water for the use of the inhabitants of any county in this state. I.C. § 7-701(2). Before property may be taken by condemnation, it must be shown that "the use to which it is to be applied is a use authorized by law" and that "the taking is necessary to such use." I.C. § 7-704. An absolute necessity is not required; there only need be a reasonable necessity for the taking of the property. *Marsh Mining Co. v. Inland Empire Min. & Mill. Co*., 30 Idaho 1, 7, 165 P. 1128, 1128 (1916). The person seeking to exercise the power of eminent domain for an easement must prove either "that the alternative means of access were not available to them or that such means of access were not reasonably adequate or sufficient for their purposes." *Erickson*, 99 Idaho at 910, 591 P.2d at

1077. An alternative means of access is not rendered unavailable merely because it is pursuant to a license. *Id.*

The Ranchers constructed the pipelines to diminish their conveyance losses that resulted when they used the Moore Canal to transport their groundwater from their respective wells. The issue is whether the conveyance losses by using the Moore Canal as compared to the pipeline made the canal not reasonably adequate or sufficient for the Ranchers' purposes. During his deposition, the manager of the Irrigation District was shown a document listing shrinkage by week during the irrigation seasons in 2009 and 2010, and the shrinkage was from 35% to 40%. He testified that to his knowledge, the percentages were roughly accurate. He also testified that the conveyance loss is apportioned equally for everyone who has water transported via the Moore Canal. Thus, the question is whether conveyance losses of 35% to 40% from using the Moore Canal make the canal not reasonably adequate or sufficient for the Ranchers' purposes?

"The contour and formation of the state and its industries of mining and irrigation made it absolutely necessary for the complete development of the resources of the state to have very liberal laws on the subject of eminent domain." *Connolly v. Woods*, 13 Idaho 591, 598-99, 92 P. 573, 576 (1907). That is why the framers inserted Article I, § 14, into our Constitution. *Id.* at 599, 92 P. at 576. "The policy of the law of this State is to secure the maximum use and benefit, and least wasteful use, of its water resources." *Poole v. Olaveson*, 82 Idaho 496, 502, 356 P.2d 61, 65 (1960). An unreasonable and excessive conveyance loss is against public policy. *Basinger v. Taylor*, 36 Idaho 591, 597, 211 P. 1085, 1086 (1922) (a conveyance loss of 50%). In *Bennett v. Nourse*, 22 Idaho 249, 125 P. 1038 (1912), we rejected the contention of an appropriator that he should have been awarded 240 inches of water instead of 160 inches because he lost about half the water as it flowed in his ditch from the point of diversion to his land. In doing so, we stated that "it stands every water user in hand to construct his ditch so that there will be the least possible waste of water, and, no doubt by either piping or cementing portions of the ditch where the greatest waste occurs, [appellant] can save much of his water." *Id.* at 254, 125 P. at 1040. In *Reynolds Irr. Dist. v. Sproat*, 69 Idaho 315, 206 P.2d 774 (1948), the owners of the servient estate complained that the owner of the easement for an irrigation ditch across their property was tiling a portion of the ditch, thereby depriving them of their right to use it. In rejecting their argument, we stated, "Assuming that it is being installed to prevent waste, or to increase the effective use of water, it is the policy of the law to encourage rather than discourage

8

such measures." *Id.* at 334, 206 P.2d at 786. In *Reno*, we held that where appropriators had performed work in the channel of a natural watercourse to reduce the amount of water lost by infiltrating into the ground, they were entitled to be awarded the amount by which they thereby increased the flow of water. 32 Idaho at 6, 178 P. at 83. These cases show that this State's policy to secure the maximum use and benefit, and least wasteful use, of its water resources includes taking reasonable measures to reduce conveyance losses of irrigation water.

In its memorandum decision, the district court stated as follows:

> The evidence is undisputed that there have been large fluctuations in delivered water and the Plaintiffs, when using the Moore Canal, have not consistently received their proportionate share of water when considering the volume of water put into the Canal. The evidence establishes that use of the Canal has been very inefficient in delivering water to Plaintiffs such that they have been unable to irrigate the full amount of acreage authorized by the water rights.
>
> . . . .
>
> Use of the pipeline would obviously eliminate shrinkage as water traveled through the pipeline. The large fluctuations of water delivered through the Moore Canal would be eliminated. Plaintiffs would not bear the burden of shrinkage and conveyance losses as determined by the District. There is further no genuine dispute that through the pipeline more water will actually reach Plaintiffs' property from the wells thereby allowing Plaintiffs to reclaim and/or irrigate more acres. But for additional, constant, and reliable amounts of water being conveyed to the properties, portions of Plaintiffs' properties would be unfit for their intended and favored use.
>
> It is also important to consider whether the benefits of the proposed easement are outweighed by the damage to Defendants' property. The subject pipeline crosses Defendants property near where the Moore Canal crosses. There is no evidence that the pipeline would have any material effect on Defendants' use or intended use of the property. Additionally, the evidence establishes that the location of the pipeline is the most logical and reasonable under the circumstances.
>
> Therefore, while use of the Canal may have been considered viable historically, the Court finds from the evidence that there is a reasonable necessity for use of the pipeline.

Obviously, the Moore Canal would not be an alternative means of conveying the water saved by using the pipeline instead of the canal. The district court did not err in holding that there was a reasonable necessity for using the pipeline.

In connection with this assignment of error, the Cains also argue that the district court ignored conditions placed on the water rights of Telford Lands and PU Ranch that required them to transport the water from their two wells by means of the Moore Canal. In opposition to the

9

Ranchers' motion for partial summary judgment, the Cains attached to their memorandum water right reports printed from the website of the Idaho Department of Water Resources. With respect to Telford Lands, the reports included as one of the conditions of approval the statement, "Water delivered through the Moore Diversion and Timberdome Canal." The PU Ranch water right report included a statement, "No more than 2.90 cfs or 435 acre feet per annum shall be injected into the Moore Canal." The Cains argued that this showed there was an existing means for Telford Lands to transport water from its well. In response, the Ranchers presented the affidavit Ernest Carlsen, who had been a 33-year employee of the Department. He stated that the Department uses the word "shall" when requiring the water right holder to do or not to do something and that it "will sometimes include remarks in a transfer approval that are added for explanatory purposes only, generally to provide information to the state-employed water master to aid in on the ground delivery of water diverted under the water right." He then averred that the statement regarding the use of the Moore and Timberdome Canals did not use the word "shall" and so did not require that the water be delivered through those canals, but rather "it informs the watermaster that as of the date of the transfer approval, water actually is delivered through the Moore and Timberdome Canals." The Ranchers also filed the affidavit of James Cefalo, the Water Resources Program Manager for the Department's eastern regional office, who stated that Ernest Carlson's affidavit is consistent with the Department's current policy. In its decision granting the Rancher's motion for partial summary judgment as to their condemnation claim, the district court wrote that "identification of a delivery system in a permit, license, transfer application or other similar document is for descriptive purposes only and has no binding effect for purposes of the pending motions."

The Cains filed a motion for reconsideration, in which they argued, among other things, "It is not the province of this court to render a nullity the conditions that have been legitimately imposed by an administrative agency of the State of Idaho." They relied for their argument upon the affidavit of Dr. Charles E. Brockway, who stated that in addition to the elements of water rights listed in Idaho Code section 42-1411(2), "the rights themselves also contain additional conditions of approval and sometimes remarks relative to each of these water rights" and that "[t]he additional conditions of approval further explain and define the water rights and provide direction to the Watermaster for administration of the right." Notably lacking from Dr. Brockway's carefully crafted affidavit was any assertion that the specific statements at issue

10

were mandatory requirements for exercising the water rights. He did not mention or refer to those statements in his affidavit. The district court did not err in holding that these statements were not mandatory requirements for exercising the water rights.

## IV.
## Were the Ranchers Entitled to Exercise the Right of Eminent Domain?

The Cains question whether the Ranchers should be able to exercise the power of eminent domain where their properties are currently under irrigation. They rely upon the statement in *Canyon View Irr. Co. v. Twin Falls Canal Co.*, 101 Idaho 604, 619 P.2d 122 (1980), that "[t]he irrigation and reclamation of arid lands is a well recognized public use, Idaho Const. art. 1, § 14, and art. 15, § 1; I.C. § 7–701(3), even if the irrigation project is ostensibly intended to benefit only private individuals." *Id*. at 607, 619 P.2d at 125. The question raised by the Cains was not an issue in the *Canyon View* case, and there is nothing in that opinion even coming close to addressing it.

The issue in *Canyon View* was whether one irrigation district, which had purchased or was in the process of purchasing water that it sought to put to a beneficial use, could condemn the right to use the existing canal system of another irrigation district. In addressing the issue, this Court made the statement quoted above. There is absolutely nothing in the opinion that could reasonably be interpreted as indicating that the statement was a limitation on the right to condemn a right-of-way for transporting water.

Article I, § 14, of the Constitution of the State of Idaho permits a private person to condemn land "for rights of way for the construction of canals, ditches, flumes or pipes, to convey water to the place of use for any useful, beneficial or necessary purpose." Idaho Code section 42-1106 states, "In case of the refusal of the owners or claimants of any lands, through which any ditch, canal or conduit is proposed to be made or constructed, to allow passage thereof, the person or persons desiring the right of way may proceed as in the law of eminent domain." Idaho Code section 7-701 allows the power of eminent domain to be exercised for "pipes for conducting water . . . for the use of the inhabitants of any county." The Cains do not point to any language in the constitutional provision or in the statutes that they contend supports the restriction that they suggest. The issue is simply whether the water that would flow through the pipe would be put to a beneficial use, and under Idaho law it clearly would be.

11

# V.
## Was the Ranchers' Complaint Facially Deficient?

The Cains contend that the decision of the district court should be dismissed on the ground that the Ranchers' complaint was facially deficient because it did not contain a legal description of the property to be taken and did not adequately allege a good faith attempt to purchase the property.

With respect to the first alleged deficiency, the Cains did not raise that issue to the district court. Idaho Code section 7-707(4) states that if a right-of-way is sought in a condemnation action, "the complaint must show the location, general route and termini, and must be accompanied with maps thereof." The complaint in this case had a map of the pipeline attached. Any deficiency that there may be in the description of the right-of-way to be condemned does not affect the subject matter jurisdiction of the trial court. The Cains did not challenge the sufficiency of the description of the proposed right-of-way by moving to dismiss the complaint, or by requesting a more definite statement, or in any other manner. After the district court had granted the Ranchers' motion for partial summary judgment and had denied the Cains' motion for reconsideration, the Cains did object to the proposed judgment on the ground that "[n]o legal description of property sought to be taken was ever included in the Plaintiffs' Complaint." An objection to the proposed judgment was not an objection to the sufficiency of the complaint. We will not consider issues raised for the first time on appeal. *Clear Springs Foods, Inc. v. Spackman*, 150 Idaho 790, 812, 252 P.3d 71, 93 (2011).

Idaho Code section 7-707(7) also requires that where the owner of the lands sought to be taken resides in the county where the lands are situated, the complaint must contain a statement that "the plaintiff has sought, in good faith, to purchase the lands so sought to be taken, or settle with the owner for the damages which might result to his property from the taking thereof, and was unable to make any reasonable bargain therefor, or settlement of such damages." The Cains admit that "[t]he Ranchers further asserted in their Complaint that they had undertaken the requisite good faith negotiations with the Cains." The Cains do not challenge the sufficiency of the allegation in the complaint. Rather, they assert that the Ranchers' "alleged 'good faith negotiations' occurred at a point in time some number of months after they had already taken the Cains' property for their own use." The Cains do not contend that there were no good faith

negotiations prior to the filing of this lawsuit. They only contend that the negotiations must have occurred prior to the installation of the pipeline. As the district court correctly held, "A plain reading of § 7-707(7) indicates that the requirement of good faith effort to resolve the dispute must only be made prior to the filing of the lawsuit." The Cains do not cite any authority to the contrary, nor do they point to any language in the statute that could be read as supporting their contention.

## VI.
## Did the District Court Err in Failing to Dismiss Telford Lands as a Party?

The Cains moved to dismiss Telford Lands for lack of standing, but the supporting memorandum only argued that Telford Lands did not have standing to pursue a claim for condemning a right-of-way across the Cains' property. The motion stated that it was "based on I.R.C.P. Rule 17(a), and ·is supported by the Memorandum submitted herewith", but the supporting memorandum only addressed the condemnation claim, stating that "Telford has no standing, and is not a real party in interest, to claim an easement over and across the lands of the Defendants." The Ranchers contended that Telford Lands had standing to pursue a condemnation claim because: (a) the costs of the project were shared by the three Ranchers, making the project economically feasible; (b) Telford Lands's well produced the most water and was necessary to be combined with the others' water to provide a sufficient head to flow through the Timberdome Canal; and (c) Telford Lands had a two-year lease to use water from the Old Moss Well, which flowed in the pipeline across the Cains' property. The district court held that Telford Lands had standing to prosecute the condemnation claim based upon its water lease.

On appeal, the Cains contend, "The mere fact that someone holds a temporary lease from the state's water supply bank does not give rise to the private power of eminent domain." They cite no authority for that contention. Under Article I, § 14, of the Idaho Constitution, an easement for a temporary use can be condemned. *Blackwell Lumber Co.,* 29 Idaho at 427-28, 160 P. at 266-67 (the right-of-way for a temporary logging railroad). Therefore, the district court did not err in denying the motion to dismiss Telford Lands as to the condemnation claim.

However, when an easement is condemned for a temporary use, the judgment must limit the time that the party can use the land subject to the condemned easement to the length needed for that use. *Id*. at 435-36, 160 P. at 269. The judgment in this case did not limit the right of

Telford Lands to use the pipeline across the Cains' land to the duration of its water lease. The other reasons given by Telford Lands for being able to condemn an easement were correctly rejected by the district court. Telford Lands did not need an easement across the Cains' land in order to participate in paying for the construction of the pipeline project or in combining its water with that of Mr. Sorensen and PU Ranch where it empties into the Timberdome Canal. On remand, the district court must modify the judgment with respect to the right of Telford Lands to use the pipeline across the Cains' property in accordance with the duration of Telford Lands's right to use water that is conveyed through that pipeline.

## VII.
### Did the District Court Err in Dismissing the Cains' Counterclaim for Trespass?

The Ranchers installed the pipeline across the Cains' property before they had obtained the judgment of condemnation. There is conflicting evidence as to whether they did so with or without the permission of Mr. Cain. The Cains filed a counterclaim for trespass, and the Ranchers understandably did not move for summary judgment on the counterclaim because of the conflicting evidence. In the final judgment entered on September 30, 2011, the district court dismissed the Cains' counterclaim. Both sides then requested an award of attorney fees and court costs. In its decision on the respective requests for an award of court costs and attorney fees entered on November 22, 2011, the district court stated, "Defendants also essentially abandoned the trespass claim, apparently concluding that there was little point in pursing [sic] that claim in view of the Court's ruling." The court did not give any basis for that conclusion, although it may be possible that the court believed that the Cains did not intend to pursue the counterclaim after the court ruled that the Ranchers could condemn the easement.

In their brief on summary judgment, the Cains stated: "The Cains have counterclaimed against the Plaintiffs seeking to enjoin the trespass by compelling the removal of the pipeline from their property. The Cains have not sought monetary damages against the Plaintiffs other than to seek a recovery of their attorney fees and costs incurred in defending against this action." If the counterclaim was only to eject the Ranchers, then it would have been resolved by the judgment for condemnation. In addition, after the court entered the judgment, the Cains filed their memorandum of costs, but did not bring up the issue that the court had incorrectly dismissed their counterclaim.

14

However, there is nothing in the record indicating that the Cains ever stated that they intended to abandon that claim. On appeal, the Ranchers do not even address the district court's dismissal of the Cains' counterclaim. Based upon the record, we must vacate the dismissal of the counterclaim and remand this case for further proceedings regarding that issue.

## VIII.
### Did the District Court Abuse Its Discretion in Not Awarding Attorney Fees to the Cains?

The Cains sought an award of attorney fees pursuant to Idaho Code sections 7-718 and 12-121. Section 7-718 provides for the awarding of court costs, not attorney fees.[1] With respect to a condemnation claim, section 12-121 permits the district court in its discretion to award reasonable attorney fees to the condemnee without a finding that the condemnation claim was brought and pursued frivolously, unreasonably or without foundation. *Ada Cnty. Highway Dist. By and Through Fairbanks v. Acarrequi*, 105 Idaho 873, 876-77, 673 P.2d 1067, 1070-71 (1983). The Cains contend that the district court abused its discretion in refusing to award them attorney fees for the condemnation claim. In deciding whether a trial court abused its discretion, this Court considers:

> (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the boundaries of this discretion and consistent with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason.

*Rockefeller v. Grabow*, 139 Idaho 538, 545, 82 P.3d 450, 457 (2003).

The Cains first argue that the Ranchers were not entitled to bring a condemnation action and that "it seems clear that their case was brought and pursued frivolously and unreasonably, and without legal foundation." As this opinion makes clear, the Ranchers were entitled to bring a condemnation action, and they prevailed on that claim both in the district court and on appeal. The Cains also state that "[t]he courts of this state have long recognized the right of a condemnee to reasonably put the condemnor to his proof as to the necessity issue, without regard to the issue of the ultimate award of monetary damages." That statement is incorrect. As we stated in *Acarrequi*, "[I]n considering the award of attorneys' fees to a condemnee, a condemnor should

---

[1] We overrule *State ex rel. Winder v. Canyon Vista Family Ltd. P'ship*, 148 Idaho 718, 731, 228 P.3d 985, 998 (2010), to the extent that it states to the contrary.

15

have reasonably made a timely offer of settlement of at least 90 per cent of the ultimate jury verdict." 105 Idaho at 878, 673 P.2d at 1072. We added that such offer "should be made within a reasonable period after the institution of the action, to relieve the condemnee not only of the expense but of the time, inconvenience and apprehension involved in such litigation, and also to eliminate the cloud which may hang over the condemnee's title to the property." Prior to instituting this action, the Ranchers had offered the Cains from $500 to $5,000 in damages, but the Cains had rejected those offers and demanded sums of $100,000 or more. They ultimately settled for $500 as their damages. The district court found, "Plaintiffs made an early offer to purchase the easement and/or property at a very fair and reasonable price, which was rejected by Defendants." The Cains have failed to show that the district court abused its discretion in refusing to award them attorney fees for defending the condemnation action.

The standard for awarding attorney fees on the other claims in the lawsuit differs from the standard for awarding attorney fees on the condemnation claim. With respect to the other claims, the district court could award the Cains attorney fees under section 12-121 only if it found that the Cains were the prevailing party and that the Ranchers pursued their other claims and defended the Cains' counterclaim unreasonably, frivolously, or without foundation. "If there is a legitimate, triable issue of fact or a legitimate issue of law, attorney fees may not be awarded under this statute even though the losing party has asserted factual or legal claims that are frivolous, unreasonable, or without foundation." *Thomas v. Madsen*, 142 Idaho 635, 639, 132 P.3d 392, 396 (2006). The entire course of the litigation must be taken into account. *Coward v. Hadley*, 150 Idaho 282, 289-90, 246 P.3d 391, 398-99 (2010). Because we vacate the dismissal of the Cains' counterclaim, any decision on the awarding of attorney fees and court costs regarding the other claims must await the resolution of the counterclaim so that the entire course of the litigation can be taken into account.

## IX.
### Should Either the Cains or the Ranchers Be Awarded Attorney Fees on Appeal?

Both sides seek an award of attorney fees on appeal pursuant to Idaho Code section 12-121. We have discretion to award a condemnee an award of attorney fees on appeal under that statute, *State ex rel. Smith v. Jardine*, 130 Idaho 318, 322, 940 P.2d 1137, 1141 (1997), and otherwise we will award attorney fees on appeal under that statute only "when this court is left

with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably or without foundation," *Minich v. Gem State Developers, Inc*., 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979). Considering the issues raised on appeal and the resolution of those issues, we decline to award any attorney fees on appeal.

## X.
## Conclusion.

We vacate the portions of the judgment that dismiss the Cains' counterclaim and that award Telford Lands a perpetual easement across the Cains' property, and we affirm the remainder of the judgment. We do not award attorney fees on appeal, and because both sides prevailed in part we do not award costs on appeal. We remand the case for further proceedings that are consistent with this opinion.

Chief Justice BURDICK, Justices W. JONES, HORTON and J. Pro Tem NAFTZ **CONCUR.**